BENBROOK LAW GROUP, PC
BRADLEY A. BENBROOK (SBN 177786)
STEPHEN M. DUVERNAY (SBN 250957)
701 University Avenue, Suite 106
Sacramento, CA  95825
Telephone: (916) 447-4900
brad@benbrooklawgroup.com
steve@benbrooklawgroup.com

Attorneys for Plaintiff Rajiv Dharnidharka

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAJIV DHARNIDHARKA,<br><br>    Plaintiff,<br><br>    v.<br><br>AMOR NEILL THUPARI,<br><br>    Defendant. | Case No.:<br><br>**COMPLAINT** |

Plaintiff Rajiv Dharnidharka complains of Defendant Amor Neill Thupari and alleges:

**INTRODUCTION**

1. Dharnidharka brings this suit to recover damages for defamatory statements made by his former subordinate and mentee Thupari to senior DLA Piper LLP (US) personnel that contributed to the firm's forcing Dharnidharka to resign from partnership in September 2024 while on medical leave. Seeing an opportunity while Dharnidharka was recovering from a February 2024 stroke, Thupari's defamatory statements were part of a scheme to poach Dharnidharka's business and pave the path for his own partnership.

2. In forcing out Dharnidharka, DLA followed a practice its leaders have used for years on its attorneys. Indeed, it happens enough that the practice has a name: "More through less." DLA preys on vulnerable attorneys by forcing them out, blocking them from retaining their clients, and ultimately generating more money for senior partners. Here, DLA engaged in a series of hostile employment actions against Dharnidharka while he attempted to recover from his stroke, culminating in a forced resignation—all while scheming to steal his clients, have Thupari step in at a far lower compensation level, and redistribute the profits to the partners at the top.[1]

3. At the center of the firm's efforts was its weaponization of Thupari. To further his own ambitions, Thupari made up a false story about Dharnidharka soliciting him to leave the firm when Dharnidharka in fact told him the exact opposite after DLA's General Counsel and then Co-US Managing Partner raised the issue. Thupari wanted to take down Dharnidharka to further his personal goal of becoming a partner. It worked.

4. Within hours of Dharnidharka's forced departure from DLA, Thupari began pitching Dharnidharka's business. DLA then made him a partner in the next partnership class.

5. Dharnidharka is entitled to recover damages from Thupari for the *per se* and actual damages caused by his defamation.

---

[1] Dharnidharka has filed a separate charge of employment discrimination with the Equal Employment Opportunity Commission against DLA for violating the multiple prohibitions in the Americans with Disabilities Act, the California Fair Employment and Housing Act, and the California Family Rights Act. EEOC Claim No. 556-2025-00834 (filed June 26, 2025).

COMPLAINT
-1-

**JURISDICTION AND VENUE**

6. This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(1) because it is a civil action between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7. Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claims occurred in this district.

8. This Court has personal jurisdiction over Defendant Thupari because, as set forth in further detail below, Thupari purposefully directed his activities toward California, Dharnidharka's claims arise out of those activities, Dharnidharka's injury arises from those activities, and the Court's exercise of jurisdiction would be reasonable. Thupari intentionally directed defamatory communications toward California that concerned Dharnidharka's activities in California. These communications have harmed Dharnidharka, such that "the reputation-based 'effects'" of Thupari's defamatory communications connect him to California. *Walden v. Fiore*, 571 U.S. 277, 287–88 (2014). In his efforts to tarnish Dharnidharka and conceal his actions, moreover, Thupari directed communications to California residents (including Dharnidharka and other California-based DLA personnel). Thupari's actions were "aimed at [California] itself" and "for the very purpose of having their consequences felt in" California. *Burri L. PA v. Skurla*, 35 F.4th 1207, 1215 (9th Cir. 2022). And in making his defamatory statements, Thupari knew that his actions would harm Dharnidharka in California. *Id.* at 1215–16. In short, Thupari's actions sufficiently connect him to California such that this Court may exercise personal jurisdiction over him. *See generally Calder v. Jones*, 465 U.S. 783, 787–89 (1984).

**THE PARTIES**

9. Plaintiff Rajiv Dharnidharka is a California resident who resides in Sacramento County.

10. Defendant Amor Neill Thupari is a Maryland resident.

# GENERAL ALLEGATIONS

## I. The Ascent: Dharnidharka Builds A Successful Intellectual Property Law Practice Over 20 Years At DLA.

11. DLA is a massive global law firm. DLA reported $4.24 billion in gross revenue in 2024, and its nearly 5,000 lawyers are spread across approximately 90 offices, in over 40 countries, on six continents. It is third in number of attorneys and annual revenue in the world.

12. DLA's predecessor firm (Gray Cary Ware & Freidenrich LLP) hired Dharnidharka as a litigation associate at its Palo Alto office upon his graduation from Santa Clara University School of Law in 2004. After Gray Cary transformed into DLA through a three-way merger in 2005, Dharnidharka settled in Sacramento and split his time among the firm's three Northern California offices (Palo Alto, San Francisco, and Sacramento).

13. Over the next two decades, Dharnidharka worked up the firm's ranks and built a reputation as one of its preeminent intellectual property litigators. He was promoted to "of counsel" in January 2013 and elevated to partner the following year.

14. In January 2023, following his completion of the DLA Emerging Leaders Program, Dharnidharka transferred from the firm's Litigation practice group to the firm's Intellectual Property & Technology practice group where he co-founded a national trade secrets practice. He is now nationally ranked Band 2 by *Chambers USA* for trade secret litigation. He kept several lawyers across the country busy with work that he generated. In 2023, Dharnidharka generated over $4 million in revenues for DLA with a high profit margin for the firm.

15. As Dharnidharka was building this trade secret practice for DLA, tensions began to arise with leadership. In 2022 and 2023, the firm began to downsize the Sacramento office and prepare for its ultimate closure. At the same time, as Dharnidharka's revenues and client development grew, his requests for greater compensation fell on deaf ears. Instead of boosting his

compensation, the firm assigned partnership "credit" for several of his matters to senior partners who had little to do with the work or its origination.[2]

## II. The Disability: Dharnidharka Suffered A Stroke, But DLA Expected Him To Keep Working While He Was Disabled And Attempting To Recover.

16. On February 17, 2024, Dharnidharka had a cryptogenic left middle cerebral artery territory ischemic stroke that left him physically and mentally incapacitated for the vast majority of nearly every day. This was a shock: Dharnidharka was young—only 45 years old at the time—and healthy. After leaving the hospital, he reported the stroke and incapacitation to the head of the Intellectual Property & Technology practice group (Sean Cunningham) and was approved for full short-term disability benefits. This allowed DLA to receive payment from the firm's insurer to cover Dharnidharka's salary (as opposed to providing a benefit to Dharnidharka, which only happens if coverage switches from short-term to long-term medical leave).

17. Instead of placing Dharnidharka on a protected leave of absence under CFRA or FMLA, DLA encouraged Dharnidharka to keep working to keep his clients at the firm and to keep the lawyers who worked on his matters busy to prevent these clients and these valued colleagues from leaving the firm due to his incapacitation. During this period, Dharnidharka managed to open dozens of new matters for existing and new clients and provided work to dozens of lawyers at DLA across all levels of experience ranging from the most junior of associates to partners. Whenever Dharnidharka provided work to colleagues, he informed them of his disability and temporary incapacitation to prevent any disruption if they could not reach him or if he was unable to communicate coherently. He provided the same notice to all clients and gave them the opportunity to work with others instead of him, which none elected.

---

[2] For example, Dharnidharka was lead trial counsel for major litigation where the client (Client 1) requested Dharnidharka for the matter, the matter was a complete victory for Client 1, and generated more than $6 million in collected billings. Over Dharnidharka's objection, the firm allocated less than $500,000 of the collections to his origination credit and assigned the remainder to the "relationship partner." On another matter where Dharnidharka was lead trial counsel and selected by the client (Client 2) for the matter, Dharnidharka's team obtained a complete victory for Client 2 and Dharnidharka received *no* origination credit for the matter. On the flipside, for a client where Dharnidharka was the "relationship partner" for matters that generated millions of dollars for the firm (Client 3), the firm gave Dharnidharka *no* origination credit and gave all of the origination credit to the partner handling the day-to-day work.

COMPLAINT
-4-

18.  Under its duty to accommodate Dharnidharka's disability, DLA should have assured Dharnidharka that, out of its thousands of other lawyers, the firm had ample resources to cover Dharnidharka's work while he was recovering, and he should have been placed on a protected leave of absence under CFRA/FMLA. But the opposite happened. It was business as usual for DLA with Dharnidharka's compensation covered by disability insurance.

19.  As a result, while Dharnidharka was fully disabled for over five months, on a near-daily basis, Dharnidharka interacted with clients and coordinated with his colleagues to make sure all necessary work was done properly, on time, and on budget. This was no easy task. In the months following the stroke, Dharnidharka slept approximately 12 hours at night and took two naps during the day, each generally an hour or more. He would go to bed around 8:00 pm and wake up without an alarm around 8:00 am. He would then lay in bed for 30 minutes to an hour and listen to "white" noise and then soft music to ease out of the sleep cycle, as if he were horribly jet-lagged. He would slowly perform his morning hygiene routine, take his medications, eat breakfast, and then start skimming email and voicemails to triage and task-out the items in his inbox. He would take a first nap between 11:00 am and 1:00 pm depending on his energy levels and then listen to white noise and music before getting up again. He would again skim and triage emails, task-out projects, and return calls. He would eat lunch and then take a second nap, following a similar post-nap routine. If he had the mental and physical stamina, he would review emails in the afternoon and return phone calls. He would exercise and meditate at night, take more medications, check his blood pressure, and go to bed. During this period of time, as with many patients who have had similar strokes, he struggled with short-term memory, sensory disfunction, and mental stability.

20.  Despite being disabled, Dharnidharka billed 235.6 hours from March–July 2024, equivalent to roughly 25% of his 1900 hour billable-hour expectation. Meanwhile, as noted above, the firm was receiving short-term disability insurance proceeds to pay Dharnidharka's full monthly compensation.

21.  Dharnidharka also spent countless additional hours handling administrative matters for the firm while disabled. In particular, he spent a significant amount of time during this period trying to resolve the firm's internal conflicts process for one of his clients ("Client 4"). This client

was on track to generate substantial revenue in 2024. Dharnidharka was the firm's "relationship partner" for the client. In or around April 2024, the client told Dharnidharka that it wanted to retain him to handle several matters. This retention, however, involved the complicated (and in this case laborious) process of clearing conflicts within DLA. As the process dragged on into the summer, the client became uneasy with the firm's capacity to handle the engagement.

22. Dharnidharka also spent many hours mentoring Thupari, then a senior associate in the firm's Baltimore office. Thupari selected Dharnidharka, even though he was disabled, to be one of his "Catalyst" mentors. Catalyst is a program DLA launched in 2024 for partner-candidate associates to prepare for applying for the "partner" label. A Catalyst mentor, as Dharnidharka understands, was supposed to help the senior associate build his or her business plan and formulate his or her candidacy for partnership, especially in Thupari's litigation group where there were far more candidates than available partnership slots. Dharnidharka had only met Thupari in the weeks before his stroke and had staffed him on some matters. Thupari hoped to be made partner soon—notwithstanding the greater number of candidates than available slots—and he believed that Dharnidharka's business and support was key to those plans. As a result, Thupari called, texted, and emailed Dharnidharka constantly throughout the summer of 2024 to wring his hands about whether the conflict issues would be resolved and to ask Dharnidharka for help building his case for partnership.

23. At some point in the summer of 2024, DLA's senior management secretly decided to employ its "more through less" strategy against Dharnidharka by using his disability as a way to kick him out of the firm and help the far lower-paid Thupari attempt to take his clients and redistribute those profits.

**III. The Squeeze: Thupari and DLA Exploit Dharnidharka's Disability, Force Him Out Of The Firm, And Work Behind His Back To Secure His Business For Thupari.**

24. Dharnidharka eventually learned that DLA's senior-most partners and partners in its general counsel's office were not only callous, but calculating. On August 1, 2024, Dharnidharka received medical clearance to return to work on a part time basis of up to 50%. While he was on the mend, but in no shape to return to full-time practice, the firm began activating its secret plan to force

Dharnidharka out by exploiting his ongoing disability. Dharnidharka was aware of a rumor that the firm exploited vulnerable attorneys who brought in substantial business through the "more through less" plot. After devoting 20 years to the firm and even honoring the firm's expectation that he keep working while struggling to recover from his stroke, Dharnidharka never imagined that DLA would unleash that strategy on him and plot to move his practice to Thupari.

25. At the center of these efforts was the firm's weaponization of Thupari. To further his own ambitions, in the summer of 2024, Thupari began telling DLA senior personnel that Dharnidharka was soliciting him to leave the firm, culminating with Thupari's defamatory statements to DLA senior personnel that form the cause of action in this complaint. In reality, between recovery and work, Dharnidharka had zero time or energy to plot to leave DLA while on medical leave with an associate he had just met a few months before. He had no such plan, let alone the physical energy or ability to do so. Dharnidharka was not even expecting to be medically cleared to return to work full-time until around January or February 2025.

26. But Thupari needed a hook to attempt to push Dharnidharka out and (he hoped) assume responsibility for handling his client's many new matters, so he generated the story by incessantly asking Dharnidharka what would happen if they could not clear conflicts for the anticipated client matters. In that context, Dharnidharka observed (accurately) that sometimes big firms make a choice on clients, and if DLA doesn't choose to clear conflicts for the client, they may have to go work somewhere else if they wanted to keep doing work for the client. Dharnidharka engaged in these conversations (1) to keep Thupari focused on work as opposed to frantic, as his work product was deteriorating and (2) to keep Thupari focused on his Catalyst business plan to become a partner.[3] Thupari spun Dharnidharka's statements and Dharnidharka's Catalyst mentorship to fit his desired outcome: push out an injured Dharnidharka and take over his business.

---

[3] Thupari regularly told Dharnidharka about work for other partners he hated to do and was a potential dead end for his career, discussed work he thought he could bring into the firm—including in the sports area—that he feared other partners would block, and asked Dharnidharka for guidance. Dharnidharka's guidance was simple: (1) Thupari needed to develop enough business such that the firm's management and other partners would be okay with other attorneys taking over the case work Thupari did not want to do and (2) he needed the firm to consider him a flight risk if they refused to allow him to open matters, including a specific sports team he hoped to make a client, such that the firm would allow him to open matters.

COMPLAINT
-7-

27. DLA's senior management and general counsel's office apparently saw Thupari's storytelling as a means to move forward with the "more through less" scam on Dharnidharka notwithstanding his disability because it served their overlapping interest well: They could expand the pie for the firm's senior leadership by sweeping in the millions of dollars that Dharnidharka's business was generating for the firm, not pay him, and pay Thupari far less. And because Dharnidharka was incapacitated, they calculated, he would be left in the cold—no competitor firm would want to hire a disabled senior lawyer whose clients weren't sticking with him and whose (real) team would not join him—with Thupari ready to step in. To the extent DLA's senior management and general counsel's office actually believed Dharnidharka had the energy to plot and execute an elaborate plan, it evidenced a cynical mentality that his disability was overblown or merely a cover (consistent with the firm's position that Dharnidharka would be working while on full disability).

28. In any event, on August 21, 2024, the firm's General Counsel (Elisha King) and then Co-US Managing Partner (Rick Chesley, now Global Managing Partner) scheduled a meeting with Dharnidharka. He expected the meeting to focus on his stroke recovery and needed accommodations. Instead, King and Chesley generically accused Dharnidharka of soliciting associates to leave the firm. Dharnidharka did not know then—but learned several months later—that it was a set up and that Thupari had been in their ear for months.

29. King and Chesley refused to provide Dharnidharka any context and demanded that Dharnidharka explain any "solicitation" of any associate by him. Dharnidharka told them the claim was ridiculous and provided context around (1) Thupari's background (summarized above) and (2) Sacramento associates worried about their futures in view of the office closure. When King and Chesley could not provide any details for it—and did not so much as hint that Thupari was the cause of the issue—Dharnidharka assumed there had been some sort of misunderstanding. Dharnidharka confirmed what should have been obvious: in his debilitated state he was expending all of his available energy on work for the firm. Before his stroke, Dharnidharka had spoken with DLA Chairman Frank Ryan about potentially leaving the firm amicably in light of the closure of the Sacramento office and other issues if they could not be resolved, and he advised Ryan at the time

that he hoped to stay at DLA. While on medical leave, he certainly had no energy or inclination to move to another firm. He also had no unsolicited offers to leave the firm. As a result, Dharnidharka had no firm for which he could even potentially solicit associates, which he explained to King and Chesley.

30. That night on August 21, 2024, Dharnidharka called the Sacramento associates and Thupari, each individually, to clear the air and to expressly state that he was not soliciting any of them to leave the firm. As detailed below, sometime after Dharnidharka's August 21, 2024 call with Thupari and before September 4, 2024, Thupari defamed Dharnidharka, stating to DLA personnel the exact opposite: that, following his meeting with King and Chesley, Dharnidharka solicited Thupari to leave DLA to join a specific law firm (which, of course, is not the firm Dharnidharka joined immediately following his forced resignation the next month). Dharnidharka did not learn of this fact until months later and had no reason to expect this defamation by Thupari.

31. The following day, on August 22, 2024, Dharnidharka received a call from Deputy General Counsel Joe Davis to discuss clearing the client conflicts logjam described above. This bolstered Dharnidharka's assumption that the solicitation confusion had been cleared up with King and Chesley. Indeed, he was thrilled that it appeared DLA was finally taking action so that the expanded representation of the client would move forward. Dharnidharka explained the situation to Davis and, over the following days, provided Davis with the necessary information to assess and resolve the situation so that the representation could proceed. Davis expressly stated that Chesley would follow up to resolve any business conflicts related to handling the client matters. Little did Dharnidharka know that he had laid the roadmap for the firm to swoop in to reap "more through less" and secure the business and redistribute it among other attorneys, including Thupari.

32. Nearly two weeks passed before King and Chesley scheduled another meeting with Dharnidharka on September 3, for September 4. Dharnidharka expected the meeting to focus on tying up the client conflict issues based on his August 22 call with Davis. He had even had a call with the client earlier that day and had told the client about the prior call with Davis and his expectation for the logjam to be cleared during his call scheduled later that day with Chesley. Dharnidharka was mistaken yet again. King and Chesley were joined on that call with Cunningham,

who looked somber and barely spoke. King and Chesley said that notwithstanding their August 21 direction to Dharnidharka to not solicit associates, they had learned that Dharnidharka thereafter solicited associates to join a specific competitor law firm. Dharnidharka explained that there was no way any such statement could be true because, as stated above, he called Thupari and two other associates the night of the prior meeting to clear the air and to confirm he had not and was not soliciting them to join another law firm. King, Chesley and Cunningham were not moved. They said the decision was made that either Dharnidharka resign or Ryan, the firm's chairman, would start a process to expel Dharnidharka from the firm. They never mentioned Thupari or otherwise suggested any involvement by Thupari in their ploy.

33.     At that point, Dharnidharka reminded them all that he was recovering from a stroke and that what they and the firm were doing was surely illegal in light of his ongoing disability. He said he needed to adjourn the meeting until he could retain counsel to represent him in what he hoped could be an amicable separation from the firm once he was medically cleared to fully return to full-duty work in January or February 2025.

34.     Needless to say, this was a shock. But it would not be the end of the matter. After Dharnidharka retained counsel to negotiate his separation, DLA deployed a series of tactics designed to further prey on his disability to leverage favorable terms in the firm's favor, compromise his reputation, and sabotage his business and his ability to ever meaningfully practice law again to position Thupari to attempt to take the business.

35.     With King on vacation in Europe, she and Ryan relegated negotiations for the firm to her junior lieutenant, Michelle Sumner. Sumner and counsel for Dharnidharka finally connected in substance by phone on Friday, September 13, 2024. During their discussion, counsel for Dharnidharka explained to Sumner that given DLA's treatment of him, their differences seemed irreconcilable, and Dharnidharka would entertain an offer to leave the firm now with a departure date in January or February 2025, when he would be medically capable of practicing law full time. Sumner said the firm wanted him to leave sooner and she would send out an offer that afternoon. No offer came that day, over the weekend, or into the next week.

36. As such, Dharnidharka continued to loyally serve clients with an expectation of amicably parting ways in early 2025. As part of his continued loyalty and diligence, Dharnidharka traveled to Scottsdale to attend the firm's Global Women's Leadership Summit on Wednesday, September 18,[4] where two of his clients would be attending.

37. On the afternoon of September 18, without warning or notice, while Dharnidharka was attempting to finish editing briefs from his hotel room before the conference started, DLA removed Dharnidharka's access to its electronic systems, including email. This had significant and immediate consequences: Dharnidharka's clients had imminent deadlines (including critical filings that week and the next week, including a significant *ex parte* opposition brief due Friday, September 20), and he now lacked the necessary tools to ensure that essential work was completed. Instead of reading and editing briefs on his computer, Dharnidharka had no option but to call the associates working on each brief and have them read the brief while he dictated edits over the phone.

38. To avoid any concern amongst the associate ranks at the firm that could distract them from delivering their best work product, Dharnidharka only told the associates his email was not working from the hotel and that he would get home soon. He did not mention that the firm had shut off his email with no client knowledge and no plan. Notably, one of the people Dharnidharka communicated with that afternoon regarding impending work product was Thupari. While Dharnidharka now understands Thupari had actual knowledge of the true state of affairs, he did not inform Dharnidharka and he took no steps to ensure that Dharnidharka's clients would be properly served during the attempted coup springing from his defamation.

39. That night Dharnidharka's counsel demanded that DLA turn on his email so that he could properly complete briefs and perform his fiduciary duties to his clients. The firm refused and accused him of coming to the conference to poach clients, which was incredible since the firm *required* him to be there because two of his clients were there.

---

[4] This was done at the firm's encouragement; pursuant to DLA policy, all relationship partners with two or more client representatives at the event were required to attend.

40. Taking a significant toll on his health and well-being, Dharnidharka took the first flight back from Phoenix to Sacramento the next morning, Thursday, September 19. He had to wake up at 5:00 am to an alarm clock, something he had not done since suffering his stroke.

41. During that same morning, and without notice to Dharnidharka, his clients, or attorneys staffed on his matters (other than likely Thupari), DLA posted an auto-reply to his DLA email account that said Dharnidharka was on leave and to contact a member of the department. While Dharnidharka was on the flight home and his phone was turned off (and could not be reached), the firm's auto-reply caused a flurry of concerned outreach from clients and colleagues who reasonably assumed Dharnidharka had been hospitalized or had another stroke (which could make it easier for Thupari to persuade a client to replace Dharnidharka with him as counsel). This too took an additional and tremendous toll on Dharnidharka's health and well-being.

42. After landing in California, Dharnidharka spent the day responding to text messages and calls to let clients and colleagues know he was alive and had not suffered another stroke. He let clients know what was actually happening with his data access termination—and they were rightfully outraged at DLA.

43. At some point on Thursday, September 19, a client (Client 5) demanded that the firm restore Dharnidharka's access to his email or face malpractice claims related to the *ex parte* opposition brief due the next day. After midnight in the early hours of Friday, September 20, 2024, while Dharnidharka was asleep, based on the demands of Client 5, the firm reinstated Dharnidharka's email and computer access for the day. Later that morning, the firm informed Dharnidharka of this access and that it would be turned off again as soon as the filing for Client 5 was completed that day.

44. Having no choice and knowing he would have no computer or email access later that day (Friday, September 20), Dharnidharka tendered his forced resignation with no resolution in place regarding payment for compensation due and repayment of his capital account, among other financial, medical, and transition matters. He had no time to spare because he needed to make a court appearance for a client on Tuesday, September 24, and thus needed to be released from DLA to be able to join another firm immediately to avoid prejudice to the client.

45. DLA accepted his resignation and stated that it would negotiate in good faith thereafter, but it manifestly failed to do so. Instead, it continued to take steps with Thupari stemming from his defamation to increase the odds that they could take Dharnidharka's practice. For example, Dharnidharka requested that he or the firm send out a brief note to colleagues about his departure, which is a common practice at firms, including at DLA. The exact text Dharnidharka proposed was:

> "Colleagues: Today is my last day at the Firm. I have enjoyed my 20 years here, and cherish the bonds and friendships established. I wish you the best in your future endeavors, personally and professionally. I extend a special thank you and deep appreciation to the many of you who helped me with my medical recovery."

The text would allow colleagues to know that Dharnidharka was healthy and leaving the firm, as opposed to hospitalized or worse. Yet DLA refused. In hindsight, Dharnidharka understands that this refusal was a strategic decision to prevent colleagues from knowing he was leaving and functional—as opposed to fully incapacitated—to, among other things, facilitate the firm's plan that Thupari and others could take Dharnidharka's business.

46. With Dharnidharka out by Friday evening on September 20, Thupari and DLA wasted no time. The next day (Saturday, September 21), Thupari sent a pitch to take over pending and future matters for a client. This detailed plan was obviously not something Thupari whipped up the night before; it plainly involved advanced coordination with, and support from, DLA's senior management as part of the "more through less" playbook. For example, Dharnidharka is informed and believes that this pitch proposed that the firm's Chair of Litigation (Ilana Eisenstein) and an office managing partner, among other senior partners, would step in to take a lead role and oversee Thupari's work. The pitch also intimated that Dharnidharka was not capable of servicing client needs in his present condition and that the other colleagues that supported Dharnidharka and the client would not be joining Dharnidharka wherever he landed, making Thupari and his new team the only viable option for the client—especially with a Tuesday, September 24 hearing days away.

COMPLAINT
-13-

47.     That weekend, Dharnidharka was able to arrange to move to another firm.[5] DLA then took steps to prevent one partner from immediately leaving the firm and joining Dharnidharka at the firm he would be joining the upcoming Monday to further the image that Dharnidharka had no support, was still disabled, and Thupari was the solution. DLA refused to release the partner to join Dharnidharka until another client, Client 6, informed DLA that it would take action if DLA failed to release the partner to join and support Dharnidharka as he continued to recover. Even then, DLA took steps to block DLA attorneys who continued to jointly service clients with Dharnidharka by blocking email between them to further manufacture the impression that Dharnidharka was non-responsive and that Thupari should take over.[6] In short, DLA took all steps imaginable to sabotage Dharnidharka and his practice because of his disability at a time and in a manner the firm thought would be most likely to position itself to take all of his business with Thupari and leave Dharnidharka without recourse.

48.     To be sure, Dharnidharka's termination cannot be blamed on his 2024 conduct or performance. Despite suffering a stroke on February 17, 2024 and his constructive termination on September 20, 2024, the firm had **collected** $3.42 million on his "origination," $3.52 million on his "billings," and $755k on his own "working" hours during the fiscal year. There was over $1.3 million in accounts receivable on his billings and approximately $260k of work in progress on his billings. In other words, as of his last day at the firm and 8.5 months into the year, Dharnidharka had provided nearly $5 million of value to the firm. Incredibly, Dharnidharka had essentially met the full-year collections target set by the firm despite working for six months while disabled. And yet the firm has withheld compensation due to him, clawed back his 2024 bonus (based on his 2023 performance), clawed back his 2024 tax advances (used to pay income taxes on compensation DLA ended up not paying him), hijacked his capital account, and zeroed out his PREP pension.

---

[5] Dharnidharka did not join the firm DLA accused him of soliciting Thupari to join. The stark irony in DLA's and Thupari's stated position and defamation is had Dharnidharka truly been plotting to join a specific firm and take Thupari with him, Dharnidharka would have joined that firm. But Dharnidharka did not do so. He joined a different firm, one that was willing to hire Dharnidharka over a weekend, and where many of his then-former colleagues worked.

[6] When pressed by a client, Thupari admitted that his DLA email with Dharnidharka's new email account had been blocked, which of course made the client's transition to remain with Dharnidharka—and away from DLA and Thupari—more difficult for the client.

**IV.   The Betrayal Unravels: Dharnidharka Learns of Thupari's False Accusations Months Later.**

49.   As described above, sometime between August 21 and September 4, 2024, after Dharnidharka's August 21 meeting with King and Chesley, Thupari communicated to DLA leadership (including King and Chesley) that Dharnidharka had solicited him to leave DLA and join another law firm.

50.   This statement was false. In fact, in his August 21 call with Thupari, Dharnidharka confirmed that he was *not* soliciting Thupari to leave DLA and join him at another law firm.

51.   Additionally, in pursuing his efforts to tarnish Dharnidharka's reputation, Thupari contacted two California-based DLA colleagues in connection with his efforts to conjure up a defamatory story about Dharnidharka's alleged solicitation.

52.   On information and belief, Dharnidharka alleges that both before and after Dharnidharka's forced resignation from DLA, DLA personnel (including King and Chesley) have repeated Thupari's defamatory statements in accusing Dharnidharka of soliciting associates to leave the firm. Thupari is liable for the repetition of his defamatory remarks because such repetition was reasonably foreseeable. *See Shively v. Bozanich*, 31 Cal. 4th 1230, 1243 (2003); *Mitchell v. Super. Ct.*, 37 Cal. 3d 268, 281 (1984).

53.   When King and Chesley confronted Dharnidharka on September 4, Dharnidharka did not suspect that Thupari was the source of the defamatory lie they indirectly referenced in their accusations on September 4. In fact, Thupari actively concealed his role in the firm's actions in his communications with Dharnidharka.

54.   Several months after his departure from DLA, Dharnidharka learned (via DLA's counsel) that it was Thupari who started the initial inquiry earlier in the summer of 2024, and it was Thupari who falsely and defamatorily claimed that during his August 21, 2024 call with Dharnidharka that Dharnidharka solicited him to join a specific law firm—as opposed to the truth that Dharnidharka confirmed he was not soliciting him to join another law firm.

## CLAIM FOR RELIEF

## DEFAMATION

55. Plaintiff incorporates here by reference paragraphs 1 through 54, *supra*, as if fully set forth herein.

56. As set forth above, on or after August 21, 2024, Thupari falsely stated to DLA senior personnel that Dharnidharka solicited DLA associates (including at least Thupari) to leave DLA and join Dharnidharka at another law firm.

57. Thupari's statements were false: Dharnidharka made the exact opposite statement on August 21, 2024.

58. Thupari's statements were defamatory *per se*. *See, e.g.*, *Burrill v. Nair*, 217 Cal. App. 4th 357, 383 (2013) ("[F]alse statements … tending directly to injure a plaintiff in respect to his or her profession by imputing dishonesty or questionable professional conduct are defamatory per se.").

59. As a result of Thupari's defamation, Dharnidharka has suffered damages in an amount to be proven at trial.

60. Dharnidharka's damages exceed $75,000.

61. In making the defamatory statements identified above, Thupari acted with oppression, fraud, or malice, and he engaged in such conduct in order to injure and damage Dharnidharka with a conscious disregard of Dharnidharka and his rights. Dharnidharka is therefore entitled to punitive damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully requests:

1. *Per se* damages;
2. Compensatory damages in an amount to be proven at trial;
3. Punitive damages;
4. Pre-judgment and post-judgment interest
5. For costs of suit;
6. For other appropriate relief.

**JURY TRIAL DEMAND**

Plaintiff demands a trial by jury of all issues so triable of right.

Dated:  August 29, 2025						BENBROOK LAW GROUP, PC

								By  /s/ Bradley A. Benbrook
								     BRADLEY A. BENBROOK
								     Attorneys for Plaintiff